### COBB v. CLOUGH et al.

(Circuit Court, D. Minnesota, Third Division. June 24, 1897.)

1. EQUITY PLEADING—BILL FOR INJUNCTION—VERIFICATION—DEMURRER.
    The fact that a bill for injunction was not verified in the usual manner employed when the bill is made the basis of a temporary injunction is immaterial on the hearing of a demurrer to the bill, since the demurrer admits all the allegations which are material and well pleaded.

2. PUBLIC LANDS—RAILWAY-AID GRANTS—CHANGE OF TERMINUS.
    In 1875 the legislature of Minnesota granted certain swamp land received from the United States in aid of a railroad. In 1881, and before the road was built, the state constitution was amended so as to require that all swamp lands then held by the state should be sold in the same manner as school lands. Thereafter, with the consent of the legislature, one terminus of the road was changed somewhat so as to require a relocation of part of the line, but without any substantial departure from the original scheme or intention. Held, that the amendment did not prevent the grant from attaching to the new location, especially as it appeared that, because of deficiencies within the grant limits, the grant would, in any event, cover all the swamp lands in the region in controversy, so that the lands which would pass were in no wise changed by the change of location.

**3. Jurisdiction of Federal Courts—Suits against State Officers—Constitutional Law.**

A suit to enjoin the principal officers of a state from proceeding, under unconstitutional acts of the state legislature, to sell, as school lands, lands claimed by complainants under a prior railroad grant, and from instituting suits to recover the lands from the railroad company and its grantees, is not a suit against the state, so as to be beyond the jurisdiction of the federal courts under the eleventh amendment to the federal constitution.

**4. Same—Injunction.**

As, however, the state itself cannot in such case be made a party to the injunction suit, and consequently no decree can be made finally concluding its rights, the injunction, if one is granted, should be so framed that, while forbidding a multiplicity of suits against the railroad company's grantees, it should yet permit the state to bring a suit against the company itself, and perhaps a selected grantee, for the purpose of testing its title.

This is a bill for an injunction against the governor and other officers of the state of Minnesota to enjoin them from selling, conveying, or clouding the title of the land grant of the Duluth & Iron Range Railroad Company, or from bringing suits to cloud the title thereto. The Duluth & Iron Range Railroad Company was made a party defendant, and filed its cross bill, and also made a motion for an injunction. From the original bill and cross bill, which are substantially the same, the following facts appear:

The complainant is the trustee of a mortgage made by the Duluth & Iron Range Railroad Company upon the land grant, and the defendants are the governor, state auditor, and treasurer as a board of land commissioners, and the state auditor as commissioner of the land office, and the governor, state auditor, and attorney general as a committee, under the act of the legislature of Minnesota for the year 1897, to bring suits against the railroad company for a forfeiture of the grant. The facts, as appearing from the bill and admitted upon the hearing, are: On September 28. 1850. congress passed an act granting all the swamp and overflowed lands, made unfit thereby for cultivation, to the state of Arkansas for the purpose of reclaiming the same. By act of congress approved March 12. 1860, this grant of swamp lands was extended to the state of Minnesota. By an act entitled "An act granting certain swamp lands to the Duluth & Iron Range Railroad Company," approved March 9, 1875, the legislature granted to the Duluth & Iron Range Railroad Company 10 sections per mile for each mile of its road completed, and the right to select the deficiency anywhere in the counties of St. Louis, Lake, and Cook. This grant was made for the purpose of aiding the Duluth & Iron Range Railroad Company to construct a railroad from Duluth, by the shortest and most feasible route, to the northeast corner of township No. 60, range No. 12 W., on the Mesaba iron range. And it was further provided: "That when the governor of the state shall be duly notified (by the company aforesaid), of the completion of each and every ten miles of said road, it shall be his duty to have same examined by sworn commissioners, and on their certificate of the completion of each consecutive ten miles in a good and substantial manner as contemplated by this act, he shall notify the secretary of state, who shall forthwith cause swamp land certificates to be issued to the president and directors of said railroad company for the number of acres to which they shall be entitled under this act," etc. The time for the completion of the road was extended twice,—once by the act of 1876, and again by the act of 1883. The act of 1883 extended the time until 1888, and provided that none of the lands should be deeded until the entire road was constructed. It further provided that the corporation might relocate and change the line of its road so as to make the northern terminus thereof at some convenient point to be selected by the corporation in township No. 62 N., of range No. 15 W. In 1881 the constitution of the state was amended by adopting the following provision: "All swamp lands now held by the state, or that may hereafter accrue to the state, shall be appraised and sold in the same manner and by the same officers, and the minimum price shall be the same, less one-third, as is provided by law for the appraisement and sale of

school lands under the provisions of title one of chapter thirty-eight of the General Statutes. The principal of all funds derived from sales of swamp lands, as aforesaid, shall forever be preserved inviolate and undiminished. One-half of the proceeds of said principal shall be appropriated to the common school fund of the state. The remaining one-half shall be appropriated to the educational and charitable institutions of the state, in the relative ratio of cost to support said institutions." The bill then alleges that the railroad company accepted this act, surveyed its line as it is now constructed from Duluth to the iron mines, in township No. 62 N., of range No. 15 W., and filed its map of said survey on the 28th day of May, 1883, and on or before December, 1886, constructed the road, the same being 94.8 miles in length: that the governor appointed commissioners, who examined the road, and reported its completion, and that thereafter the state of Minnesota deeded to the company, at various times between May 2, 1888, and December 24, 1894, about 201,000 acres of land: that the various deeds contained a recital of the laws under which the grant was made, and of a compliance therewith, and of the construction of the road between the points selected, to wit, the city of Duluth and a point at the iron mines in township No. 62 N., of range No. 15 W. It further appears that the railroad company has selected 189,979.73 acres of land that has not yet been deeded, and the total number of acres to which it is entitled is 606,720 acres: that the company has already sold to various parties about 20,000 acres of these lands; that by an act of the legislature approved April 21, 1897, the above land grant, with all lands heretofore deeded to the railroad company, and by it conveyed to other parties, was forfeited to the state of Minnesota absolutely, and the proper officers of the state were directed to sell the same as school lands are sold; and by a further act of the legislature approved April 23, 1897, the governor, state auditor, and attorney general were authorized to institute legal proceedings against any of said parties to recover said lands. The bill alleged that, unless restrained by the order and injunction of this court, the state auditor and governor, and said board of land commissioners, would sell and convey said lands, and the timber thereon, or lease the lands, and thereby cloud the title of the complainant; and that the said governor, state auditor, and attorney general would bring various suits against the Duluth & Iron Range Railroad Company, the trustee of the mortgage, and the various parties, grantees of said railroad company, to recover said lands; and prayed an injunction.

Frank B. Kellogg, for complainant.

W. N. Draper and J. H. Chandler, for defendant Duluth & I. R. R. Co.

The Attorney General, Henry C. Belden, and W. P. Warner, for defendants state officers.

LOCHREN, District Judge. This case has been very fully argued on both sides, and there seems to be no dispute as to the facts. The matters set forth in the bill of complaint are admitted by the demurrers in the case, and this renders immaterial the last question raised by counsel for defendants, as to the verification of the bill. The demurrers admit the statements in the bill to be correct, and therefore, although the bill is not verified in the manner usually done when the bill is made the basis of a temporary injunction, I think it obviates any objection upon that ground. The result of the demurrers is that all allegations stated in the bill which are material and well pleaded are admitted, but, of course, mere conclusions are not admitted. It seems that in the year 1860 congress granted swamp lands to the state of Minnesota for certain objects indicated, among which were internal improvements. In the year 1875 the legislature granted to the Duluth & Iron Range Railroad Company 10 sections per mile, to be selected within 10 miles of the

railroad, to be built by the shortest and most feasible route, between fixed termini, Duluth being the southern terminus, and the other at some point in section 60. range 12, on condition that 20 miles of the road was to be built in 2 years, and the entire road in 5 years. The lands were to be certified and patented to the company as each 10 miles of road was completed and certified to be properly completed by commissioners appointed by the governor. Any deficiency in the 10 sections per mile within the 10-mile limit was to be made up by selections within the counties of St. Louis, Lake, and Cook. On filing the map of the route, all other swamp land within the 10-mile limit was thereby withdrawn from other disposition. The time for building the railroad was extended from time to time by acts of the legislature, and by an act of that body passed in 1883, I believe, the northern terminus of the railroad was changed further west, and a little north, necessitating a change of location of part of the line; and the railroad was finally completed within the time limited by the last act, and certified to be properly built, completed, and to be transacting business over its entire line, by a commissioner appointed by the governor to make examination of these facts. The grant of lands by the act of 1875 was a present grant upon conditions subsequent. No forfeiture for breach of condition was ever declared, either by legislative act or judicial decree; the condition was finally performed, and such performance accepted by the state, through its executive, in whom that power was vested; and some 201,000 acres of the land were patented to the railroad company. After the grant, and before the road was built and the conditions subsequent were performed, the constitution of the state was amended so as to prohibit the granting of swamp lands in aid of railroads. This could not affect the prior grant of 1875, which stood as a valid existing grant and contract; but it is claimed that as the northern terminus of the road was changed, and the line also changed, subsequent to that amendment, the land grant would not attach to the changed line. But, had there been no such amendment of the constitution, it would not be claimed that merely such change of terminus and line would have detached the grant made by the original act. There can be no doubt that, if there had been no change in the constitution, the state, with consent of the company, could have changed the northern terminus and the location of the road, without saying anything further about the grant, and not affect the grant; and it seems to me if this grant to the road made by the act of 1875, which was a present grant at the time, was not affected by the amendment, that it would not be affected by this change in the constitution, so long as it was merely a change in the line, allowing it to remain substantially in the place where it was originally designated, and not departing substantially from the original scheme or intention; although it might be a different case were the change so radical in direction or length as to make it clear that it involved a new and entirely different enterprise.

Moreover, the allegations of the bill are that the deficiency as to the 10-mile limit will cover all swamp lands in the three counties named. If so, the land grant is in no way changed from what it would have been had the road been built between the termini first

named. It was not, therefore, changed so as to affect any lands which were not covered by the act of 1875 before the amendment prohibiting the granting of swamp lands for such enterprises. All these questions, and the right of this railroad company to this land grant, seem to have been decided in its favor by the supreme court of Minnesota in the case of Minneapolis & St. C. R. Co. v. Duluth & W. R. Co., 45 Minn. 104, 47 N. W. 464, referred to by counsel.

The right of the railroad company to these lands, and the right of complainant, as the trustee under the mortgage, with respect to these lands, appears to be clear, not only to the lands which have been formally conveyed by the governor, but also to the other lands covered by the grant, although not so conveyed, nor perhaps even specially designated by selection. They belong to the railroad company beneficially, and in equity, and are covered by the mortgage to complainant, although the bare legal title may still remain in the state. The state has no right in respect to the lands, except to perform its contract by investing the railroad company with the title. I speak, of course, of the case as presented by the bill and admitted by the demurrers. But for the immunity of the state as sovereign, and under the eleventh amendment to the federal constitution, there could be no question that a suit would lie against it directly to restrain its action, if it threatened to dispose of or embarrass the title to these lands, to the prejudice of the railroad company or the complainant.

This action is to restrain the officers of the state, its governor, auditor, and treasurer, who form an executive commission, from disposing of the title to any of these lands, or the timber or minerals, as they were directed to do by the act of the legislature of 1897, and to restrain the governor, auditor, and attorney general from commencing action against the grantees of the railroad company, or persons having contracts with respect to the lands, or the timber and minerals, with the railroad company, as also directed by said act of the legislature, and which would obviously cloud the title of the railroad company to the lands, and bring multiplicity of actions. The serious objection urged by defendants is that; although the state of Minnesota is not nominally made a party defendant, yet this suit against all the chief executive officers of the state, in respect to a matter in which the state by its legislature claims an interest which it has directed these officers to assert and maintain, is in reality a suit against the state. It must be admitted that, if it is not such a suit, it comes perilously near the line. The decisions on this subject are numerous, and, in my judgment, not conflicting. The state can bring suits and assert its rights in court, but cannot be brought into court, to litigate a right claimed against it, without its consent. But a state is bound by the constitution of the United States as much as any citizen, and any enactment of the state impairing the obligation of a contract is void, though its contracts cannot be actively enforced in the courts without its consent. Thus, no action against the state can be maintained, without its consent, to collect an indebtedness of the state or compel it to perform its contracts, or for any kind of positive and affirmative relief. On

the other hand, any enactment of a state legislature impairing the obligation of a contract, or tending to devest vested rights, is absolutely void. In law, being null, it is not the act of the state; and if a state officer, under color of such void enactment, attempts or threatens any acts tending to impair or interfere with contractual or vested rights, it will not be regarded as the act of the state, and such officer will be restrained from such unlawful affirmative action, whether he purposes to act in the name of the state, or in his official or personal name. Thus, proposed prosecutions of a criminal or penal nature or form, which if begun would have to be instituted in the name of the state, have been enjoined in some cases which have been cited on the hearing.

The theory governing these cases appears to be, not so much the theory that the immunity to the states is a shield and not a weapon, as that the state being absolutely bound by the federal constitution, its enactments, in contravention of that instrument, are absolutely void, to the extent that they will not be recognized as acts of the state, nor afford color of defense in protecting officials of the state acting or threatening to act thereunder, and renders the plea of official character of such persons immaterial. Therefore the doctrine of the Minnesota supreme court that the governor and executive officers are not amenable to the process of the courts in respect to the discharge of their official duties has no bearing in a case of this kind; because, if they are liable at all, in respect to matters of this kind, it is because they are passing outside their official duties, and that, while they are attempting to do what is directed by an act of the legislature, they are doing an act which is not supported by any valid law. So it does not seem to me that the doctrine of the Minnesota court has any special bearing in this case. While the federal courts have gone to considerable length to sustain the position that state officers may be restrained from acts impairing contractual or vested rights, the authority to grant injunctions in such cases has been limited to remedial relief. I think the case of Osborn v. Bank, 9 Wheat. 738, cited on both sides, is a signal instance of this kind. In that case a large sum of money (some $98,000) had been taken by state officers from a bank of the United States, under what was held to be a void enactment. An action to recover that money was allowed to be maintained against the officers of the state, although it was admitted that it could not be maintained against the state itself. It was permitted to be maintained against the successors of the officers who took the money. It was claimed that the money had been kept separate from other moneys of the state in the treasury, and therefore could be identified; but it was none the less claimed to be the money of the state, collected by the officers under the laws of the state. There is also the case which has been cited as arising in South Carolina (Tindal v. Wesley, 17 Sup. Ct. 770), which was an action to recover real estate in Columbia, S. C., of an officer of the state,—the secretary of state, —who was in possession of the property. The answer alleged it to be the property of the state, and that it was in defendant's possession as such officer. It was found by the court that the property had

83 F.—39

been actually sold by the state to the plaintiff. There was no question that it had once belonged to the state; but the action was maintained, although it was admitted that the state, if it had any claim, might bring an action to assert that claim. I think these two cases perhaps go as far as any that have been cited on either side.

The result is, as it seems to me, that this injunction must be granted. The only question in my mind is with respect to the restraint against bringing any action. I do not think there is any doubt that the injunction should be broad enough to prevent actions being brought against the grantees of the railroad company,—a multiplicity of actions; but I think a single action might be permitted against the railroad company, if desired, in order to bring the matter up in proper form. If it is thought fit to bring a single action in any court, I doubt if I should restrain the bringing of such action against the railroad company and Mr. Cobb. The further hearing of this case, as to the form of the decree to be granted, was then adjourned until the 9th day of July, 1897.

### (July 9, 1897.)

After hearing arguments with respect to the form or injunction to be granted, the court rendered the following decision:

I should agree with Mr. Kellogg entirely, if we could bring the state of Minnesota into court, and settle this matter definitely by a decree which would finally determine the interests of all persons who have, or claim to have, any interest in this property. Such course would be consonant with the practice of courts of equity. From the case as presented, it appears, as I stated heretofore, that this land grant was made to the railroad company many years ago,—a grant in præsenti, with conditions subsequent. The conditions, it also appears, were performed, and the lands in part were patented to the railroad company. Now, there is nothing presented casting any doubt upon the title of the railroad company to these lands, except simply questions that arise from a change in one of the termini, and that really makes no difference whatever in the land grant. It would have been the same if the railroad had been built to the first-named termini, instead of as at present. I think no question has been suggested as to the power of the state and the railroad company, acting concurrently, to change these termini, without affecting the grant that was given. The other question arises from the change in the constitution in 1883, and that would not affect the prior grant made to the railroad company by the state, to which the railroad company had a vested right. There has been no suggestion which really casts any doubt at all upon the right of the railroad company to this grant, and the decision of the supreme court of Minnesota, which has been referred to in 45 Minn. and 47 N. W., confirms that title. So that a case is presented of a property right which ought to be protected, as far as a court can protect it, from being disturbed by any action casting cloud upon the title, or interfering with the possessors, by harassing them with a multiplicity of suits. The difficulty with the case is that the state of Minnesota cannot be brought here into court against its will.

No action can be taken which will result in the final determination of the rights of everybody as to these lands. Whatever the final judgment of this court may be, the state of Minnesota is not and will not be bound by it. It hardly seems to me that such action can properly be taken as will in effect restrain, or have any legal effect amounting to an absolute restraint against, the state of Minnesota, so as to prevent it from bringing any action to test its claim, whatever it may be, to these lands. And, as that matter cannot be determined here, I am inclined to think that this injunction should be issued, as indicated by me the other day. I am still of opinion that permission should be granted to the state to choose another forum, if it desires to select one; at any rate, that an opportunity should be given it to test its claim to these lands. I do not think the state ought to be allowed, or that these officers ought to be allowed, to bring a multiplicity of suits against the grantees of the railroad company at this time. It seems to me it will be sufficient to bring one suit against the railroad company, and perhaps Mr. Cobb, and, if it is thought necessary, to join one or more other parties, in order to test the question of their rights as bona fide purchasers under their deeds from the railroad company following the deeds from the state.